# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PEARL CITY ELEVATOR, INC.,  )
an Illinois cooperative,  )
  )
        Plaintiff,  )
  )
      v.  )    **C.A. No. 2020-0419-JRS**
  )
ROD GIESEKE, JAY BUTSON and  )
DAN HOLLAND,  )
  )
        Defendants,  )
  )
    and  )
  )
ADKINS ENERGY, LLC, a Delaware  )
limited liability company,  )
  )
      Nominal Defendant.  )

## MEMORANDUM OPINION

Date Submitted:  January 21, 2021
Date Decided:  March 23, 2021

Kurt M. Heyman, Esquire and Aaron M. Nelson, Esquire of Heyman Enerio Gattuso & Hirzel LLP, Wilmington, Delaware and Eric M. Fogel, Esquire, Victor Peterson, Esquire and Nikhil Mehta, Esquire of SmithAmundsen LLC, Chicago, Illinois, Attorneys for Plaintiff Pearl City Elevator, Inc.

David A. Felice, Esquire of Bailey & Glasser, LLP, Wilmington, Delaware and Brian A. Glasser, Esquire, Elliott McGraw, Esquire and Britney A. Littles, Esquire of Bailey & Glasser, LLP, Washington, DC, Attorneys for Defendants Rod Gieseke, Jay Butson and Dan Holland.

Laura G. Readinger, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware, Attorney for Nominal Defendant Adkins Energy, LLC.

**SLIGHTS, Vice Chancellor**

Adkins Energy Cooperative (the "Coop") was formed to operate as a dry mill corn-to-ethanol and biodiesel production facility owned by local farmers in or around Lena, Illinois.[1]  In 2011, Plaintiff, Pearl City Elevator, Inc., made a cash investment in the Coop in exchange for 50% of the outstanding membership units of the reorganized Adkins Energy, LLC ("Adkins" or the "Company"), with the previous unitholders of the Coop (the "General Members") holding the other half of Adkins' units.  Under Adkins' Third Amended Operating Agreement (the "Agreement"), both Pearl City and the General Members were entitled to appoint three members each to Adkins' board of governors (the "Pearl City Governors" and the "General Governors," respectively, and together, the "Board").[2] Neither faction was permitted to cast a vote in the election of the other's designated Governors.[3]  Thus, the Agreement divided ownership and control equally between Pearl City and the General Members.

---

[1] Joint Pre-Trial Stip. and Order (D.I. 122) ("PTO") ¶ 10; Trial Tr. (D.I. 133–34) ("Trial Tr. __ (witness name)") 12:7–10, 33:23–34:2 (Ramsel), 345:4–6 (Huffman); Joint Trial Ex. ("JX") 156 ¶ 8.  I cite to the Verified Compl. pursuant to 6 *Del. C.* §§ 18-109, 18-110 and 18-111 (D.I. 1) as "Compl. __," the Post-Trial Tr. (D.I. 154) as "Post-Trial Tr. __," and lodged depositions as "(Name) Dep. __."

[2] JX 1 ("OA").

[3] The current General Governors are Defendants, Rod Gieseke, Jay Butson and Dan Holland ("Defendants").

1

Pearl City initiated this action under 6 *Del. C.* § 18-110 ("Section 18-110") to obtain a declaratory judgment that it has lawfully altered Adkins' 50/50 governance structure by acquiring sufficient equity in the Company to justify its designation of a seventh Governor to the Board. The lawfulness of Pearl City's claim to control depends upon its compliance with the control-related provisions of the Agreement. Section 5.2 of the Agreement, by all accounts a heavily negotiated provision, entitles either faction to elect an additional Governor upon its accumulation of more than 56% of Adkins' units. To cross the 56% threshold, Pearl City and the General Members could acquire additional Adkins units through private sales or sales facilitated by a qualified matching service ("QMS"). Transfers can be made between existing Adkins members, or between existing members and new members conditioned upon the new member's execution of a Joinder Agreement, as defined in the Agreement, in which the new member commits, among other things, to be bound by the Agreement.

In May 2020, roughly nine years after the Agreement was executed, Pearl City notified the General Governors that it had acquired over 56% of Adkins' units. Citing Section 5.2, Pearl City further notified the General Governors that it intended to seat a seventh Governor on the Board. The General Governors responded by advising Pearl City it had improperly acquired units, did not meet the 56% ownership

threshold and could not, therefore, designate a seventh Governor to the Board. Pearl City filed this action shortly thereafter.

The General Governors argue Pearl City's attempt to reach the 56% threshold was ineffective on four grounds. First, they read the Agreement to require affirmative Board approval of all transfers of Adkins' units, which Pearl City did not obtain (or even request). Second, they read the Agreement to require Pearl City to provide a satisfactory legal opinion to the Board in connection with unit transfers that confirms the transferee's acquisition of units does not jeopardize Adkins' tax status or otherwise violate the Agreement, which Pearl City failed to provide. Third, they read the Agreement to require advance notice of transfers prior to their consummation, which Pearl City failed to timely deliver. Fourth and finally, the General Governors invoke the affirmative defenses of unclean hands and material breach to argue that, even if Pearl City complied with the Agreement, the Court should exercise its equitable powers to cancel Pearl City's acquisition of units.

Pearl City responds that the Agreement says nothing of "advance" notice to the Board of unit transfers and requires Board approval and delivery of a legal opinion only when units are transferred to new Members. Because each of its unit purchases were from existing Members to existing Members, those requirements do not apply. In any event, says Pearl City, even if the Agreement required legal opinions in support of intra-Member transfers, Pearl City delivered three legal

3

opinions to the Board in satisfaction of that requirement. Pearl City thus argues it has complied with the Agreement in all respects.

The matter was tried to the Court in October 2020. After careful consideration of the trial evidence and arguments of counsel, I find that: (1) affirmative Board approval is not required for intra-Member transfers; (2) the Board may defer a transfer pending a legal opinion to verify compliance with discrete areas of law enumerated in the Agreement; and (3) advance notice of transfers is not required. Pearl City has complied with the Agreement in its acquisition of Adkins' units, it is entitled under the Agreement to seat a seventh Governor on the Board, and the General Governors' affirmative defenses do not bar Pearl City from exercising that bargained-for right. Accordingly, judgment will be entered in favor of Pearl City. My reasoning follows.

## I.  BACKGROUND

The facts are drawn from the parties' pretrial stipulation and the evidence admitted at trial. The trial record consists of seven lodged depositions, 194 joint trial exhibits and testimony given during a two-day trial. The following facts were proven by a preponderance of the competent evidence.

## A. Parties and Relevant Non-Parties

Non-party, Adkins, is a Delaware LLC that owns and operates an ethanol plant in Lena, Illinois.[4] Adkins' Members, as defined in the Agreement, hold varying amounts of the 115,020 total units outstanding.[5] Adkins treats its Members as "partners" for federal income tax purposes, conferring upon them favorable pass-through taxation.[6]

Plaintiff, Pearl City, is an Illinois cooperative and Adkins' largest unitholder.[7] It provides Adkins with grain needed to produce ethanol.[8] Pearl City's cooperative members, or "patrons," are primarily farmers who buy product from Pearl City.[9] Most of Pearl City's 2,000 patrons live near Lena.[10] Approximately 280 Pearl City patrons also own Adkins' units.[11]

---

[4] PTO ¶ 4; Trial Tr. 12:7–10 (Ramsel), 345:4–6 (Huffman); JX 156 ¶ 8.

[5] OA; Trial Tr. 25:14–16 (Ramsel).

[6] JX 182 at 6; Trial Tr. 346:9–18 (Huffman).

[7] PTO ¶ 5; Trial Tr. 25:7–13 (Ramsel).

[8] Trial Tr. 11:18–23 (Ramsel).

[9] *See id.* at 10:20–11:6, 81:11–82:1 (Ramsel).

[10] *Id.* at 83:3 (Ramsel), 414:20–415:6 (Foley).

[11] *Id.* at 85:13–24 (Ramsel).

Defendant, Rod Gieseke, is a General Governor and Chairman of the Board.[12] He has continuously served on the Board since 2008.[13] He indirectly owns approximately 1,700 units through his company, RB Gieseke, Inc., making him one of the largest unitholders among the General Members.[14]

Defendant, Jay Butson, has been a General Governor since 2000.[15] He is also a Member and indirectly owns his units through the Butson family trust.[16] Specifically, he owns approximately 2,000 units, making him one of the largest individual unitholders among the General Members.[17]

Defendant, Dan Holland, is a Member and General Governor who also serves as Adkins' treasurer.[18] He has served on the Board since 2010.[19]

---

[12] *Id.* at 115:5–11 (Gieseke).

[13] *Id.* at 115:15–20 (Gieseke).

[14] *Id.* at 116:15–23 (Gieseke).

[15] *Id.* at 472:12–13 (Butson).

[16] *Id.* at 471:5–8 (Butson).

[17] *Id.* at 507:17–24 (Butson).

[18] PTO ¶ 8; JX 16.

[19] (Holland) Dep. 23:16–18.

Non-party, Elmer Rahn, is a Pearl City Governor.[20] He is also Pearl City's President and serves on the Pearl City Board.[21] He is a full-time farmer.[22]

Non-party, Matt Foley, is also a Pearl City Governor.[23] He is vice chairman of the Pearl City Board.[24] He is a full-time farmer and lives in Lena.[25] Foley has been a Pearl City patron for more than 20 years.[26]

Non-party, David Schenk, is the third Pearl City Governor.[27] He is the current secretary for the Board.[28]

Non-party, Phil Ramsel, is Pearl City's General Manager and Chief Executive Officer.[29]

---

[20] PTO ¶ 5.

[21] (Rahn) Dep. 14:10–15.

[22] *Id.*

[23] PTO ¶ 5; Trial Tr. 395:23–396:9 (Foley).

[24] Trial Tr. 395:20–22 (Foley).

[25] *Id.* at 414:13–415:9 (Foley).

[26] *Id.* at 414:5–7 (Foley).

[27] PTO ¶ 5; Trial Tr. 179:23–180:3 (Gieseke).

[28] Trial Tr. 179:21–22 (Gieseke)

[29] *Id.* at 10:8–18 (Ramsel).

Non-party, Ray Baker, is Adkins' General Manager.[30]  He has worked for Adkins since 2001 and has served as General Manager since 2011.[31]  Baker is also a Member and owns 50 units.[32]  He actively monitors activity on FNC and advises the General Governors, but not the Pearl City Governors, regarding the availability of units for purchase on FNC.[33]

Non-party, Locke Lord LLP, has been Adkins' outside counsel since 2000 and participated in the negotiation and drafting of the Agreement.[34]  Keith Parr and David Kendall are attorneys at Locke Lord who have provided legal advice to Adkins relevant to this dispute.[35]

Non-party, FNC, is an intermediary bulletin board for thinly traded equity interests in agricultural companies.[36]  Selling Members can list a nonbinding price request for their units on FNC, and buyers can place nonbinding blind offers to

---

[30] *Id.* at 227:2–4 (Baker).

[31] *Id.* at 227:5–20 (Baker).

[32] JX 28 at 4.

[33] Trial Tr. 251:6–252:18 (Baker); JX 44 at 688.

[34] Trial Tr. 117:8–118:7 (Gieseke), 276:1–13 (Baker).

[35] *Id.* at 117:8–14 (Gieseke).

[36] JX 156 ¶ 48.

purchase units on the bulletin board.[37]  A bidder will be notified of any higher bids and given the opportunity to increase his original bid.[38]  A Member who lists his units for sale does not know the identity of the bidder—including whether it is a member of the Board.[39]

## B.  The Formation of Adkins

On December 17, 1999, Adkins was formed as a Delaware limited liability company.[40]  As noted, Adkins operates a dry mill corn-to-ethanol and biodiesel production facility in Lena, Illinois,[41] and confers upon its Members favorable pass-through taxation treatment for federal income tax purposes.[42]  Adkins relies on Pearl City for its corn which is supplied through an exclusive supply arrangement captured in a Grain Delivery Agreement.[43]

---

[37] (Butson) Dep. 44:5–19; Trial Tr. 221:4–21 (Gieseke); JX 182 at 8.

[38] (Butson) Dep. 44:7–12, 46:3–11.

[39] Trial Tr. 252:19–22 (Baker); JX 14.

[40] PTO ¶ 9.

[41] Trial Tr. 12:7–10 (Ramsel), 345:4–6 (Huffman); JX 156 ¶ 8.

[42] JX 182 at 6; Trial Tr. 346:9–18 (Huffman).

[43] Trial Tr. 95:18–24 (Ramsel).

On August 31, 2011, Pearl City acquired 7.778% of the outstanding units from the Coop.[44] Pearl City and the Coop executed the Agreement the following day.[45] At that time, the Coop was liquidated and dissolved, and its ownership interests in Adkins were distributed to the General Members. [46] That distribution resulted in both Pearl City and the General Members each owning 57,510 units, or 50% each of Adkins' issued and outstanding units.[47]

## C. The Parties Negotiate a Unit Threshold for Board Control

The Agreement serves as Adkins' constitutive document.[48] Pearl City and the Coop are signatories to the Agreement.[49] Each Member must sign a Joinder Agreement upon first acquiring Adkins units, which binds the Member to the Agreement.[50]

Under Section 5.2 of the Agreement, Pearl City and the General Members agreed that each would appoint, as 50% unitholders, three Governors to Adkins' six-

---

[44] OA; JX 182 at 5.

[45] *See* OA.

[46] PTO ¶¶ 11–12; OA.

[47] PTO ¶ 22.

[48] OA; PTO ¶ 14.

[49] OA at 46.

[50] Trial Tr. 119:17–120:8 (Gieseke); OA § 4.4.

member Board—the Pearl City Governors and the General Governors, respectively.[51] This division of power was refined in Section 9.7, where the parties agreed that only General Members are entitled to vote in the election of the General Governors, and only Pearl City is entitled to vote in the election of the Pearl City Governors.[52]

While Adkins is a manager-managed LLC, with Baker at the helm,[53] the Board is charged under Sections 5.10 and 6.1 of the Agreement with general "authority to supervise and control all operations of the Company," except as expressly provided in the Agreement.[54] For the avoidance of doubt, Baker's employment agreement stipulated that, "Manager understands that ultimate discretion and control over the Business shall remain vested in the [Board] and Manager shall do nothing inconsistent therewith."[55]

With two factions holding equal representation on the Board, the parties were confronted with the question of how one side might one day assume majority control

---

[51] OA § 5.2; JX 156.

[52] OA § 9.7; *see also id.* at § 5.1(a).

[53] Trial Tr. 227:2–7 (Baker).

[54] OA § 5.10; *see also id.* § 6.1 (providing that "[t]he business and affairs of the Company [are] managed by and under the direction of the Board," and "[t]he management of the Company is vested in the Board").

[55] JX 28 at 304.

of Adkins' governing body. By all accounts, this issue was a central focus of the parties' negotiations.[56] The negotiations culminated in Section 5.2 of the Agreement, which sets out the procedural mechanism by which either Pearl City or the General Members (as a group) may take control of the Board. Locke Lord, as Company counsel, participated in these negotiations.[57] Section 5.2 states:

> In the event that either Pearl City or the General Member Group increase their Percentage Interest to more than fifty-six percent (56%) . . . the size of the Board of Governors shall be increased from six (6) members to seven (7) members and the Member (or group of Members, as applicable) whose Percentage Interest has increased to fifty-six percent (56%) or more shall be entitled to appoint or elect four (4) of the seven (7) members of the Board of Governors.[58]

Through Section 5.2, the parties "very clearly" understood that one faction may someday seek to gain majority control of the Board through the accumulation of units.[59]

Section 12.1 of the Agreement describes the procedures for transferring Adkins' units.[60] *First*, under Section 12.1(i), in connection with all "proposed Transfer[s]," the parties must provide a "written notice" of transfer to the Company,

---

[56] Trial Tr. 222:1–9 (Gieseke); Pl.'s Opening Post-Trial Br. (D.I. 143) at 4.

[57] *Id.* at 276:7–13 (Baker).

[58] OA § 5.2.

[59] Trial Tr. 222:1–9 (Gieseke).

[60] *See* OA § 12.1.

which must take the form of a "Notice of Proposed Transfer" ("Transfer Notice").[61]

The Transfer Notice, attached as Exhibit C to the Agreement, expressly contemplates two "[m]ethod[s] of proposed transfer": "[p]rivate sale[s]" (with "no public solicitation") and public, qualified matching service ("QMS") sales.[62] For Adkins, QMS sales occur on FNC and provide safe harbor under IRS regulations for continued favorable tax treatment.[63] Adkins' contract with FNC is governed by an executed engagement agreement called the Trading Services Agreement ("TSA"),[64] which required Adkins to maintain a Trading Service Operational Manual (the "Trading Manual") on its website and a Trading Service Summary (the "Trading Summary," together with the TSA and Trading Manual, the "FNC Documents").[65] True to form, Members historically have transferred units through both private sales and the FNC.[66]

---

[61] *Id.*; *see also* Trial Tr. 21:23–24:8 (Ramsel).

[62] Trial Tr. 39:2–11 (Ramsel), 151:18–152:10 (Gieseke), 238:20–23 (Baker).

[63] 26 C.F.R. §1.7704–1(g); Trial Tr. 40:1–4 (Ramsel) ("So Adkins is organized as a limited liability company, and they are taxed as a privately -- private partnership. So they enjoy single taxation.").

[64] JX 3.

[65] JX 35; JX 4.

[66] JX 156 ¶ 31; JX 20; Trial Tr. 122:21–123:8 (Gieseke); *see also id.* at 239:24–240:14 (Baker).

*Second*, under Section 12.1(ii), "to the extent that the proposed Transfer is not to an existing Member," the transferring Member must obtain the "affirmative consent and approval" of the transfer from the Board by simple majority vote.[67] With the Board split equally between Pearl City and General Governors, Section 12.1(ii) expressly requires bipartisan approval of transfers to non-existing Members. Section 12.1(iii) provides that, "[w]ithout limitation to the foregoing," transfers become effective upon the start of the next fiscal quarter "following the approval of such Transfer by the Board of Governors."[68]

*Third*, Section 12.1 acknowledges "that the restrictions set forth in Section 12.2 may limit the number of LLC Units that may be Transferred in a given period and, in such case, the Board shall consider such approval requests in the order in which they are received . . . and may defer" their approval "until a later date in order to comply with such limitations."[69] Section 12.2 enumerates eight categories of transfers which are, "[n]otwithstanding anything herein [the Agreement] to the contrary," prohibited.[70] The final four categories prohibit transfers that would violate the then existing provisions of certain debt financing documents, violate

---

[67] OA § 12.1.

[68] *Id.*

[69] *Id.*

[70] *Id.* § 12.2.

federal or state securities laws, or threaten Adkins' tax status.[71] To police compliance with those four legal imperatives, Section 12.2 states, "[n]o issuance or Transfer . . . may be made unless (a) an opinion of counsel, satisfactory in form and substance to the Board and counsel for the Company [is delivered to the Board] (which requirement for an opinion may be waived, in whole or in part, at the discretion of the Board)."[72] It also requires "the recipient of the LLC Units [to have] executed a Joinder Agreement."[73]

The parties dispute whether Section 12.2 requires an opinion of counsel (an "Opinion")—costing in this case several tens of thousands of dollars[74]—for every transfer under Section 12.2, or only for those transfers requiring the "execut[ion of] a Joinder Agreement," i.e., only for transfers to new members. The Board has never requested nor been provided an Opinion in the past.[75] It also has never formally waived any requirement for an Opinion for any transfer of any type or scale.[76]

---

[71] *See id.*

[72] *Id.*

[73] *Id.*

[74] Trial Tr. 53:12–54:2 (Ramsel).

[75] *Id.* at 121:12–19 (Gieseke), 423:12–22 (Foley).

[76] *Id.* at 121:20–24 (Gieseke), 424:3–6 (Foley).

*Fourth and finally*, the parties agreed under Section 16.4 that any amendment to the Agreement, including amendments to the means by which a Member could effectively transfer units, must be in writing, adopted by the Board and approved by a majority of the Members.[77] Only two amendments have been made to the Agreement since it was adopted; neither concerned provisions implicated by this litigation.[78]

## D. Pearl City Crosses the Unit Threshold

In February 2020, Pearl City initiated a campaign to accumulate units in an effort to cross Section 5.2's 56% threshold and earn the right to seat a seventh Governor. From February through May 2020, Pearl City acquired 863 units through the QMS, which were approved by the Board as required under the Trading Manual.[79] Most unit transfers, however, were facilitated through private sales.[80]

On March 5, 2020, Pearl City announced to its patrons two initiatives it was launching for the purpose of attaining the right to elect a seventh Governor (its

---

[77] OA § 16.4.

[78] *See* JX 2.

[79] PTO ¶¶ 27–28; JX 35 ("All transfers of Membership Units must be approved by the Board and must meet all of the conditions and requirements of the Operating Agreement.").

[80] Pearl City believed that private sales did not require approval from the Board under the Agreement. Whether that belief was well-founded is disputed in this litigation and will be addressed below.

fourth) to the Board.[81]  *First*, Pearl City offered to purchase units from the 280 Pearl City patrons holding Adkins' units (the "Purchase Offer").[82]  Under the Purchase Offer, Pearl City patrons could sell their units to Pearl City for $412.25 per unit, a price equal to the then-current highest offer price per Adkins Unit on FNC, less the 3% cost per unit for executing a transaction on FNC.[83]  The Purchase Offer culminated in around 40 private sales transferring 6,475 units to Pearl City.[84]  Those purchases, combined with the 863 units acquired in the FNC sales, gave Pearl City 64,848 units, representing 56.38% of the outstanding units.[85]  In other words, the FNC acquisitions and Purchase Offer acquisitions alone gave Pearl City sufficient units to install its fourth Pearl City Governor under Section 5.2 of the Agreement.

*Second*, Pearl City formed Alliance Ethanol, LLC ("Alliance Ethanol"), a wholly-owned subsidiary formed solely to exchange units of its own LLC membership interests for Adkins' units held by Pearl City patrons (the "Exchange

---

[81] JX 54; Trial Tr. 15:15–16:19, 43:22–24 (Ramsel); *id.* at 181:3–19 (Gieseke).

[82] Trial Tr. 85:5–86:8 (Ramsel).  The Purchase Offer did not extend to General Members. *Id.*

[83] PTO ¶ 24; JX 95.  No commission or fee was charged or collected for such purchases. JX 95; Trial Tr. 19:13–15 (Ramsel).  The purchases were memorialized through a Bill of Sale, which were written to "be deemed accepted upon [] execution on behalf of [Pearl City] below.  [Pearl City] shall pay the purchase price specified above [$412.25] to Seller within thirty (30) days after such acceptance."  JX 56 at 8867.

[84] JX 7; PTO ¶ 26; JX 165.

[85] Trial Tr. 25:14–22 (Ramsel).

17

Offer").[86] Each Alliance Ethanol unit entitled its holder to a pass-through of all distributions received by Alliance Ethanol from Adkins.[87] Patrons also received benefits not offered by Adkins, such as an annual dividend rate of 4% per year guaranteed by Pearl City, and costs and expenses of Alliance Ethanol borne by Pearl City.[88] Any Alliance Ethanol unitholder could either sell their units to Pearl City or require Pearl City to post its allocable share of units on FNC for sale and to pass on the sale proceeds (net FNC fees) to the unitholder.[89] While devised with some effort, the Exchange Offer ultimately was never executed, meaning Pearl City did not acquire any Adkins units through this means.[90]

The General Governors learned of Pearl City's initiatives days after they were revealed to Pearl City's Members.[91] Invoking the assistance of Locke Lord, who as Company counsel also represented the Pearl City Governors, the General Governors:

- Prevented the Pearl City Governors from sharing any Adkins information with Pearl City;[92]

---

[86] JX 56; (Ramsel) Dep. 168:8–170:8.

[87] JX 56.

[88] *Id.*

[89] *Id.*

[90] Trial Tr. 27:15–28:21 (Ramsel).

[91] *Id.* at 181:1–4 (Gieseke), 498:3–5 (Butson); JX 17 at MMS Msg on March 7, 2020, at 8:46 A.M.; JX 111; *see also* JX 5, JX 55, JX 56, JX 63, JX 67.

[92] JX 24

- Discussed forming their own LLC to "bid up" the price of units Pearl City was attempting to acquire;[93]
- Formed a Special Committee consisting of only General Governors empowered to evaluate the Exchange Offer without consulting the Pearl City Governors;[94]
- Engaged in a public letter writing campaign against the Exchange Offer (the "Fight Letters"). The Fight Letters stated Defendants' opposition to the Exchange Offer and asserted: (a) all transfers must occur on FNC; (b) Pearl City was putting Adkins' favorable single taxation status at risk; (c) Pearl City was violating federal and state securities laws; and (d) the Exchange Offer required the approval of the General Governors as a Related Transaction under Section 5.15;[95]
- Drafted a Joinder Agreement for Alliance Ethanol that differed from the standard form in several material respects;[96] and
- Revealed at the Board's monthly meeting on April 21, 2020, that the General Governors had privately decided the Pearl City Governors were not entitled to vote on whether the transfers to Alliance Ethanol would be recognized.[97]

Despite the General Governor's efforts, as noted, Pearl City was able to accumulate sufficient units to cross the threshold to take control of the Board. It then sought to assert its newfound control position.

---

[93] JX 55, JX 57; *see also* JX 17.

[94] JX 84.

[95] JX 74; JX 111; Trial Tr. 150:16–152:21 (Gieseke). The Fight Letters were drafted by Baker, with help from Locke Lord. JX 69; JX 93.

[96] Trial Tr. 263:1–264:18 (Baker).

[97] JX 70.

### E. The General Governors Refuse to Recognize Pearl City's Transfers

On May 29, 2020, hours after Pearl City filed its Complaint in this Court (in apparent anticipation of the General Governors' resistance),[98] Pearl City emailed a letter to the General Governors stating that it had increased its stake in Adkins to 64,848 units, that these acquisitions caused it to cross the 56% threshold set out in Section 5.2, and that it was now entitled to seat its fourth Governor on the Board.[99] Pearl City designated David Daly as its fourth Governor.[100] The same day, Pearl City mailed the Bills of Sale and Transfer Notices for the private sales from Pearl City patrons, which were delivered to Adkins on or around Tuesday, June 2, 2020.[101] The General Governors subsequently refused to recognize Daly as a Governor because, in their view, Pearl City's transfers did not comply with the procedures set out in the Agreement.[102]

Although Pearl City believed it unnecessary under the terms of the Agreement, on August 10, 2020, Pearl City provided the General Governors and

---

[98] *See* Compl. at 1. The General Governors had made clear prior to Pearl City's filing of the Complaint that they would not recognize Pearl City's transfers. *See* JX 74; JX 108; JX 111.

[99] PTO ¶ 32; JX 132.

[100] JX 132.

[101] PTO ¶ 33; JX 7; JX 132.

[102] *See* Trial Tr. 424:7–425:5 (Foley).

Adkins with three separate legal opinions (the "PC Opinions") addressing the five relevant legal matters flagged under Section 12.2.[103] The PC Opinions concluded that the private sales were not prohibited by the Agreement.[104] In the cover letter, Pearl City offered to dismiss its lawsuit if the General Governors dropped their opposition to Daly's appointment as Adkins' seventh Governor.[105] Although the General Governors were in possession of the Transfer Notices, Bills of Sale and the PC Opinions as of the next Board meeting (August 18, 2020), they remained steadfast in their refusal to recognize the seventh Governor.[106] Following the August 18 meeting, Locke Lord advised the General Governors that they could approve the private sales to Pearl City on the basis of the PC Opinions.[107]

## F. The General Governors Call Two Special Meetings

On August 31 and September 6, 2020, Defendants provided the Pearl City Governors with notices of two special meetings of the Board.[108] Though the notices

---

[103] PTO ¶ 34; JX 163.

[104] JX 163.

[105] *Id.*

[106] Trial Tr. 425:22–426:23 (Foley), 535:10–537:4 (Butson).

[107] JX 176; (Gieseke) Dep. 64:15–18.

[108] JX 174; JX 184.

purported to call the meetings "with the intention to approve" the private sales,[109] the General Governors actually planned to establish a quorum at the meetings, block a vote on the transfers and impose conditions to preserve the General Governors' equilibrium.[110]  Suspecting an ambush was afoot, and believing Board approval unnecessary under the Agreement, the Pearl City Governors did not attend either special meeting.[111]

## G. Procedural History

Pearl City filed its Complaint with this Court on May 29, 2020, asserting three counts.  Count I seeks a declaratory judgment under Section 18-110 that Pearl City is entitled to designate Daly as the seventh Governor of Adkins' Board.[112]  Count II asserts breach of contract against the General Governors under the Agreement for their refusal to recognize Daly as a properly designated Governor.[113]  Count III asserts breach of the covenant of good faith and fair dealing against the General Governors for refusing to comply with the Agreement's terms in bad faith.[114]  In the

---

[109] (Gieseke) Dep. 105:4–16.

[110] Trial Tr. 166:1–171:17 (Gieseke), 238:6–239:7 (Baker); JX 62.

[111] JX 177; JX 185; Trial Tr. 59:3–23 (Ramsel), 426:2–16 (Foley).

[112] Compl. ¶¶ 73–77.

[113] Compl. ¶¶ 78–83.

[114] Compl. ¶¶ 84–88.

Pre-Trial Stipulation and Order, Plaintiff narrowed its prayer for relief to a declaration that its disputed transfers were effective and a declaration that it is entitled to appoint a seventh Governor.[115] It also seeks attorneys' fees.[116]

The Court convened a two-day trial on October 21 and 22, 2020.[117] The matter was deemed submitted following post-trial briefing and closing arguments on January 21, 2021.[118]

## II. ANALYSIS

Pearl City alleges the General Governors' refusal to recognize Pearl City's designation of a seventh Governor after its accumulation of more than 56% of Adkins' units breached the unambiguous terms of the Agreement. Its request for a declaratory judgment seeks both a declaration of its rights under the Agreement and a judgement declaring that the General Governors must recognize Pearl City's fourth designated Governor. In the Pretrial Order, Pearl City appears to have collapsed its breach of contract and implied covenant claims into its claim for relief under Section 18-110. There is no claim for damages and no evidence was presented to

---

[115] PTO at 12–13.

[116] *Id.*

[117] D.I. 145–46.

[118] D.I. 143 ("Pl.'s Opening Post-Trial Br."); D.I. 147 ("Defs.' Post-Trial Br."); D.I. 149 ("Pl.'s Reply Post-Trial Br.").

support such a claim. To obtain the declaration it seeks under Section 18-110, Pearl City must demonstrate that its construction of the Agreement is superior and that the Agreement supports the relief it seeks—the placement of a seventh Governor on the Board.

The General Governors resist Pearl City's request for declaratory relief on two grounds. First, they assert Pearl City failed to adhere to the Agreement's protocols for the effective transfer of Adkins' units, including by failing to seek or obtain Board approval and failing to secure a timely Opinion endorsing the transfers.[119] Second, even if the Court finds Pearl City complied with the procedural and substantive requirements for unit transfers under the Agreement, Defendants invoke the affirmative defenses of material breach and unclean hands as grounds to foreclose any declaratory relief in this action.[120]

"The primary goal of contract interpretation is to attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted."[121] The contract is the first, and often last, place the court looks to

---

[119] Defs.' Post-Trial Br. at 5.

[120] *Id.*

[121] *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003) (internal quotations omitted).

discern the parties' "shared expectations."[122]    "If, on its face, the contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[123]

As is often the case, the parties assert the Agreement is unambiguous while simultaneously proffering very different constructions of its terms.[124]   Of course, dissensus regarding a contract's meaning among its signatories does not an ambiguous agreement make; "a contract is *ambiguous* only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[125]   By contrast, a "contract is *unambiguous* when the agreement's ordinary meaning leaves no room for uncertainty, and the plain, common, and ordinary meaning of the words . . . lends itself to only one reasonable interpretation."[126]   As the court assesses whether ambiguity exists, the

---

[122] *Greenstar IH Rep, LLC v. Tutor Perini Corp.*, 2019 WL 6525206, at *9 (Del. Ch. Dec. 4, 2019).

[123] *S'holder Representative Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at *16 (Del. Ch. Mar. 15, 2017) (internal quotations omitted).

[124] Pl.'s Opening Post-Trial Br. at 35; Defs.' Post-Trial Br. at 38.

[125] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorist Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (emphasis supplied).

[126] *Greenstar*, 2019 WL 6525206, at *9 (emphasis in original) (internal quotations and footnote omitted).

contract must be "read in full and situated in the commercial context between the parties."[127]

I begin the contract construction exercise by considering "[t]he basic business relationship between [the] parties" so that I may "give sensible life" to the Agreement when construing its terms.[128] With the Agreement's commercial context in hand, and mindful that my understanding of the parties' contractual relationship cannot overwrite an unambiguous contract,[129] I then construe the Agreement's terms.

## A. The Basic Business Relationship Between These Parties

To start, the Agreement is undisputedly the product of a compromise between two factions who, at least initially, contemplated equal ownership and control of Adkins.[130] The parties agree that Section 5.2 provides that the size of the Board "shall be increased" to seven members when either faction (the General Members or Pearl City) obtains more than a 56% stake in Adkins.[131] The parties also agree they

---

[127] *See Chicago Bridge & Iron Co. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017).

[128] *Id.* at 927.

[129] *See Solomon v. Fairway Cap, LLC*, 2019 WL 1058096, at *9 (Del. Ch. Mar. 6, 2019).

[130] OA § 5.2; Trial Tr. 222:1–9 (Gieseke); Pl.'s Opening Post-Trial Br. at 33.

[131] OA § 5.2.

recognized at signing that one side may someday attempt to gain majority control of the Board.[132] The parties' shared understanding stops there, leaving for decision: (1) whether the parties agreed that notice to the Board was required prior to attempting a transfer; (2) whether either side could move to block the transfer of units such that neither faction could cross the 56% unit threshold absent the other's consent; and (3) why the parties would agree to such an absolute structural impediment to attaining control through voluntary unit transfers.

The contractual lay of the land is straightforward. Section 12.1 (titled "Notice and Approval of Transfers") provides that a transferring Member who wishes to transfer its units "must first [] give written notice" in a specified form.[133] The provision goes on to provide that, "to the extent that the proposed Transfer is not to an existing Member," the transferring Member must "obtain the affirmative consent and approval of such Transfer from the Board of Governors, which consent shall be determined by a simple majority vote of the Board and shall not be unreasonably withheld."[134] In the very next sentence, Section 12.1 acknowledges that Section 12.2 sets forth certain restrictions that "may limit the number of LLC Units that may be Transferred in a given period and, in such case, the Board shall consider such

---

[132] Trial Tr. 222:1–16 (Gieseke).

[133] OA § 12.1.

[134] *Id.*

27

approval requests in the order in which they are received."[135]  Section 12.2 states that, "[n]otwithstanding anything herein to the contrary," a transfer may not "be made unless (a) an opinion of counsel [on four discrete legal topics] . . . which . . . may be waived . . . is delivered to the Board . . . and (b) the recipient of the Units has executed a Joinder Agreement."[136]

While Section 12.1 and 12.2 clearly reference Board approval and legal opinions, the parties dispute how these requirements fit within the larger governance framework contemplated by the Agreement.  Pearl City explains that Adkins' Members are a collection of close-knit farmers who live in or around small-town Lena, Illinois.  Wary of adding new Members from outside this community, the parties agreed that, "to the extent" a transfer was to a new Member, Board approval would be required.[137]  An Opinion might also be appropriate for transfers to non-Members to ensure that the introduction of a particular new member would not raise compliance issues.[138]  But the parties agreed that intra-Member transfers would not require an Opinion or Board approval, not only because that process would be cost prohibitive but also because, more fundamentally, the requirement of majority Board

---

[135] *Id.*

[136] *Id.* §12.2.

[137] *Id.*

[138] Post-Trial Tr. 32:11–33:22.

approval for every transfer would serve as an unworkable impediment to either faction ever being able to assume control of the Board.[139] Had the parties intended the Board's Governors to remain in a perpetual state of equilibrium by arming either faction with *de facto* veto power over unit transfers, they would not have agreed in Section 5.2 to a means by which one side might gain control through the acquisition of additional equity.[140]

Defendants paint a different "big picture." As they see it, the signatories to the Agreement confronted a serious problem: they had to ensure Adkins' pass-through tax status was preserved for its Members.[141] That status would be threatened if unit transfers exceeded a certain volume per year.[142] With this threat in mind, Defendants assert the parties empowered the Board to approve *all* unit transfers *ex ante* and to require that the transferring parties provide an Opinion that the transfer

---

[139] *Id.*; Trial Tr. 53:22–54:2 (Ramsel).

[140] I note that neither party has grappled with the final dictate of Section 12.1(ii), namely that the Board's affirmative consent "shall not be unreasonably withheld." OA § 12.1. This language arguably answers Plaintiff's concern that the Board might exercise its veto authority arbitrarily. Of course, this fact-intensive standard encourages serial disputes and litigation were it to apply to every transfer. Because the parties chose not to engage on this point, I will follow suit and not dwell on it further.

[141] *See* Defs.' Post-Trial Br. at 26; Post-Trial Tr. 76:1–3.

[142] Defs.' Post-Trial Br. at 16–17. *But see* Trial Tr. 358:1–359:16 (Huffman) (explaining that the 2 percent safe harbor is not a "cap" on trades for purposes of a partnership's trading status, as there are many safe harbors and a "facts and circumstances" test that would apply in any event).

complied with the Agreement.[143]   To avoid inefficient review of every transfer (where the cost of obtaining an Opinion could easily exceed the economic benefit of any individual transaction), the Board was authorized to waive the Opinion in particular cases.[144]   While the General Governors recognize their proffered construction—where the Board is endowed with the right to approve all transfers at its leisure—"may sound harsh," they insist "that's what they [Pearl City] agreed to when they signed onto the [Agreement]." [145]

A subtheme of Defendants' view of the Board's role in the transfer procedure is the degree of transparency with which the two competing factions would have to operate.  Under Defendants' construction of Board approval and advance notice, the Agreement would enable either party to know when the other made a move for control and counter accordingly.  Pearl City's effort to obscure its acquisition of units by, for example, providing delayed notice of the transfers, violated that understanding.

Neither party's portrayal of transactional context is impeccable.  The problem with Defendants' claim that Board approval was necessary for transparency and to preserve Adkins' tax status is that transparency evidently was available without any

[143] Post-Trial Tr. 76:2–19.

[144] *See* OA § 12.2; Post-Trial Tr. 66:10–16; Trial Tr. 53:22–54:2 (Ramsel).

[145] Post-Trial Tr. 77:9–11.

30

contractual requirement and the protection of Adkins' tax status was already built into the Agreement. More specifically, the record reveals that the General Governors knew of Pearl City's plan to assume majority control of Adkins' Board almost as soon as it was revealed to Pearl City's patrons; in fact, they quickly went to work with "Company counsel" to consider countermeasures to "fight back."[146] The apparent ease with which either side could monitor the other without any contractually hardwired transparency comes as no surprise, given both Pearl City and the General Members of Adkins comprise a small group of farmers in or around the Lena, Illinois area, a small agricultural town with a population of around 2700.[147]

---

[146] *See* JX 17 (text messages between Baker and the General Governors discussing Pearl City's offer dated as early as March 7, 2020); *see also* JX 24; JX 55; JX 57; JX 74; JX 76; JX 79; JX 111. In this regard, Locke Lord (who participated in drafting the Agreement) advised the General Governors that, in its opinion, Pearl City has grounds to "argue that . . . Transfers to an 'existing Member' [are] not subject to board approval under [the Agreement]." JX 70 at 8943. With that said, I do not share Pearl City's view of this communication as a "smoking gun." Post-Trial Tr. at 96:3–5. While it appears Locke Lord may have had some questions regarding the validity of the General Governor's reading of the Agreement, the import of this evidence is nil since the Court is charged with construing the Agreement as a matter of law and has concluded the provisions at issue are unambiguous.

[147] Trial Tr. 12:12–13 (Ramsel). Defendants argue the FNC Documents' requirement for Board approval of intra-Member transfers shows the parties contemplated Board approval in all instances. Defs.' Post-Trial Br. at 29–33. As explained in more depth below, the FNC Documents were never integrated into the Agreement and do not govern private sales. *See* OA §§ 16.4, 16.14. Thus, they have no bearing on the bargain struck by the parties in the Agreement.

As for the parties' need to protect Adkins' tax status, Section 12.2 prohibited any transfer that would cause the Company to be a publicly traded partnership.[148] The provision goes on to state clearly: "Any purported issuance or Transfer which would otherwise violate the requirements of this Section 12.2 shall be void and of no effect."[149] Thus, the parties agreed to make any unit transfer threatening Adkins' tax status or violating Section 12.2's other imperatives void *ab initio*.[150] There was no need under the Agreement for the Board to weigh in on that point before a transfer was consummated.

This lends credence to Pearl City's proffered contextual framework, where the parties agreed neither faction would be allowed to stonewall the other's attempt to accumulate more than 56% of Adkins' equity. Even so, Pearl City's explanation is wanting for a means by which the Board could discover a "void" transfer. And Pearl City's distinction between inter- and intra-Member transfers appears contrived under Section 12.2, as Pearl City admits intra-Member transfers implicate the legal matters flagged in Section 12.2 the same as extra-Member transfers.[151]

---

[148] OA § 12.2

[149] *Id.*

[150] *See Southpaw Credit Opportunity Master Fund, L.P. v. Roma Rest. Hldgs., Inc.*, 2018 WL 658734, at *7 (Del. Ch. Feb. 1, 2018) (enforcing a void *ab initio* clause).

[151] *See* Post-Trial Tr. 33:4–14.

In any event, the Court must be mindful that "Delaware has long adhered, and continues to adhere, to the objective theory of contracts."[152] "While [our courts] have recognized that contracts should be read in full and situated in the commercial context between the parties, the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement."[153] Here, the background facts point to a construction that favors Pearl City, but they are by no means definitive in that regard. As is the Delaware way, I turn to the words the parties agreed to in their contract as the best evidence of their intent.

## B. The Agreement's Procedure to Transfer Units is Unambiguous

For reasons explained below, I find the Agreement unambiguously provides the following: (1) prospective affirmative Board approval is required *only* for transfers to non-Members as a means to vet the admission of new Members; (2) the

---

[152] *Solomon*, 2019 WL 1058096, at *9 & n.89 (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232–33 (Del. 1987)).

[153] *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018) (internal quotations and footnote omitted). As contract scholars have pointed out, the specificity with which provisions are written in a contract may affect the extent to which the court relies on commercial context when construing the contract's terms. *See* Robert E. Scott & George G. Triantis, *Anticipating Litigation in Contract Design*, 115 YALE L.J. 814, 818–20 (2006) (arguing that parties can design contracts *ex ante* to provide for rule-like terms that reduce potential litigation costs *ex post*, suggesting that the extent to which the court will inquire into contextual factors is, in part, driven by the clarity with which a provision is written (*i.e.*, as a rule or standard)); Cathy Hwang & Matthew Jennejohn, *Deal Structure*, 113 NW. U. L. REV. 279, 279 (2018) (making Scott and Triantis' argument explicit and explaining how, beyond using a rule or standard, contract structure may influence the role of commercial context in contract construction).

33

Board may require a conforming Opinion verifying that *any* transfer, both as between Members and as between Members and non-Members, complies with the legal considerations identified in Section 12.2, and may defer recognition of the transfer until such Opinion is delivered; and (3) advance notice to the Board is not required before the parties to a transfer may effect their transaction, but notice is required before the transfer will be deemed effective by the Company.

1. **The Board Has Limited "Approval" Rights for Transfers of Units Between Members**

Article 12 of the Agreement governs "Transferability," and the key provision to this dispute—appropriately titled "Notice and Approval of Transfer"—is Section 12.1.[154]  That Section provides in full:

> **Before a Transferring Member may Transfer its Membership Interest (including all associated LLC Units) to any Person (including another Member), such Member must first** (i) give written notice of such proposed Transfer to the Company which notice shall describe the terms and conditions of the proposed Transfer (and, to the extent applicable, shall contain a copy of the proposed contract of sale) and shall be in the form of the Notice of Proposed Transfer included as Exhibit C hereto and (ii) **to the extent that the proposed Transfer is not to an existing Member**, obtain the **affirmative consent and approval of such Transfer from the Board of Governors**, which consent shall be determined by a simple majority vote of the Board and shall not be unreasonably withheld. **It is acknowledged that the restrictions set forth in Section 12.2 may limit the number of LLC Units that may be Transferred in a given period and, in such case, the Board shall consider such approval requests in the order in which they are received (i.e., on a "first**

---

[154] OA § 12.1.

**come, first served" basis) and may defer the approval of Transfer requests until a later date in order to comply with such limitations.**

Without limitation to the foregoing, the Board, may require the Transferring Member or its transferee to execute a Joinder Agreement and such other certificates, representations and documents and to perform such other acts as the Board may in its reasonable discretion deem reasonable or advisable (i) to verify the Transfer; (ii) to confirm that the person desiring to acquire an interest in the Company, and to be admitted as a Member, has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of this Operating Agreement; (iii) to maintain the status of the Company as a partnership for federal tax purposes; and (iv) to assure compliance with any applicable state and federal laws including securities laws and regulations. **Any Transfer of Membership Interests in accordance with this Operating Agreement shall become effective upon commencement of the Company's next fiscal quarter following the approval of such Transfer by the Board of Governors.**[155]

Pearl City asserts that Section 12.1(ii)'s "to the extent that" language makes clear that the Board has the right to exercise prospective approval rights only with respect to unit transfers between existing Members and non-Members. The General Governors respond that Section 12.1(ii) merely clarifies that a prospective transferring Member would first have to seek Board approval of the admission of a new Member before seeking Board approval of the transfer to that new Member. According to the General Governors, that pre-approval right is separate and apart from the Board's right prospectively to approve *all* unit transfers, whether between existing Members or between existing Members and non-Members.

---

[155] *Id.* (emphasis added).

The plain text of Section 12.1's first sentence (encompassing 12.1(i) and (ii)), in isolation, indicates that the Board's "affirmative consent and approval" by simple majority vote is required only "to the extent that" the transfer is to a non-Member. That language—"to the extent that"—indicates the Agreement contemplates two separate procedures based on the membership status of the recipient: (1) if the transfer is to a non-Member, "affirmative consent and approval" is required; and (2) by implication, "affirmative consent and approval" of the Board is *not* required for transfers among existing Members.[156]

Defendants' arguments based on the text of Section 12.1(ii) alone do nothing to change that analysis. Defendants point out that Section 12(i) and (ii) are connected with the conjunctive "and," not the disjunctive "or."[157] According to Defendants, this means the first sentence of Section 12.1 merely clarifies that transfers to a non-Member require Board approval; it does not purport to set out a

---

[156] *See Extent*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/extent (last visited March 14, 2021) (defining "extent" as, "the range over which something extends"); *see also Freeman v. X-Ray Assocs., P.A.*, 3 A.3d 224, 227–28 (Del. 2010) ("Because dictionaries are routine reference sources that reasonable persons use to determine the ordinary meaning of words, we often rely on them for assistance in determining the plain meaning of undefined terms.").

[157] Defs.' Post-Trial Br. at 25 n.3.

separate procedure exempting transfers between existing Members from Board approval.[158]

The problem with Defendants' argument is that the conjunctive connector between Section 12.1(i) and (ii) is qualified immediately by the phrase "to the extent that." That phrase can only reasonably be understood to contemplate a distinction between transfers to non-Members—requiring "affirmative consent and approval" of the Board—and transfers to existing Members, which are implicitly reviewed under a different process.[159] Otherwise, there would be no need to distinguish between transfers by the membership status of its recipient; the drafters would simply have written something to the effect that "all transfers require affirmative Board approval by simple majority vote." Defendants' reading would thus render Section 12.1(ii)'s "to the extent that" language superfluous, contrary to well-settled canons of contract construction.[160]

---

[158] *Id.* at 20.

[159] *Cf. Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661–62 (Del. Ch. 2012) ("The introductory phrase '[t]o the extent that' in Section 18-1101(c) does not imply that the General Assembly was agnostic about the ontological question of whether fiduciary duties exist in limited liability companies. . . . [T]he phrase '[t]o the extent that' embodies efficiency in drafting."). While it does not affect the Court's independent interpretation of the provision's terms, I note that Company counsel, Locke Lord, came to the same conclusion about Section 12.1's operation in its legal memorandum to the General Governors. JX 70.

[160] *See NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008).

Defendants also emphasize Section 12.1(i)'s reference to "proposed Transfer[s]," which they argue implies Board approval is required for any transfer to become effective. But the language "proposed Transfer" appears in both Section 12.1(i) and 12.1(ii), and yet Section 12.1(ii) still clarifies that a proposed transfer "not to an existing Member" requires affirmative Board approval.[161] Thus, reading "proposed Transfer" to imply a requirement for "the affirmative consent and approval of such Transfer from the Board" in all cases would again render Section 12.1(ii)'s language superfluous.[162]

Of course, contractual provisions cannot be read in isolation, and Defendants' argument that prospective Board approval of intra-Member transfers is required based on other language in Section 12.1 could carry more force.[163] The second sentence in Section 12.1 states that the "restrictions set forth in Section 12.2 may limit the number of LLC units that may be Transferred in a given period and, in such case, the Board shall consider such approval requests in the order in which they are

---

[161] *See* OA § 12.1.

[162] *See NAMA Hldgs.*, 948 A.2d at 419.

[163] *See Elliott Assoc., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998) ("It is well established that a court interpreting any contractual provision, including preferred stock provisions, must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument.").

received (i.e., on a 'first come, first served' basis) . . . ."[164] Defendants argue that this sentence, in tandem with an analysis of Section 12.2, makes clear Board approval is necessary for all transfers.

Pearl City responds that the Court need not refer to Section 12.2 to construe Section 12.1 for two reasons. First, Section 12.1's heading ("Notice and Approval of Transfer") makes clear it is the only operative provision governing how to effectuate transfers.[165] This argument, however, runs headlong into Section 16.7 of the Agreement, titled "Headings," which states that "[t]he headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof."[166] Pearl City's position is also contrary to the canon of construction that requires the Court to read and interpret the Agreement as a whole.[167]

---

[164] OA § 12.1.

[165] Pl.'s Reply Post-Trial Br. at 13.

[166] OA § 16.7.

[167] *See GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779–84 (Del. 2012) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein.") (internal quotations omitted).

Pearl City retreats to a textual argument, asserting the selection of determiner in Section 12.1's second sentence to modify approval—"approval of *such* Transfer" (as opposed to "any Transfer")—can only be understood to refer back to Section 12.1(ii)'s procedure for "proposed Transfer[s] . . . not to an existing Member."[168] Thus, Section 12.1's discussion of the Board's right to "defer the approval of Transfer requests until a later date" must be understood to limit only "such Transfer[s]" discussed in Section 12.1(ii), namely transfers to non-Members.

I disagree with this construction. The subject of Section 12.1's second sentence is "the restrictions set forth in Section 12.2," which "may limit the number of [] Units that may be transferred in a given period."[169] If the "limit[s]" imposed by Section 12.2 empower the Board to "defer the approval" of *all* transfer requests "until a later date," as Section 12.1 suggests, then "such approval requests" must be understood to refer to "the restrictions set forth in Section 12.2." Indeed, the Board's ability to "limit" transfers in a period by "defer[ring] the approval" of transfers on a

---

[168] OA § 12.1(ii) (emphasis added). *See Donaghy v. State*, 100 A. 696, 700 (Del. 1917) ("In the present instance it cannot be seriously contended that the framers of the Constitution meant to include any or all misdemeanors, for not only did they specify certain species of the genus which they had in mind, but they also qualified 'other misdemeanors' *not by the word 'any' but by the word 'such.'* The first or primary definition of the word 'such' in the Century Dictionary and Cyclopedia is 'of that kind'; 'of like kind or degree'; 'like'; 'similar.' A secondary meaning of the word is given as *'the same as previously mentioned or specified'; 'not other or different.'*") (emphasis added).

[169] *See* OA § 12.1.

"first come, first served" basis implies that Section 12.2 confers on the Board a constrained power of approval (i.e., the power to "defer") separate from, and more limited than, the Board's power to *reject* by "affirmative consent and approval" transfers to a non-Member, as contemplated in Section 12.1(ii).[170] If, however, Section 12.2 cannot be understood to set forth any requirements for "approval requests," then Pearl City's reading becomes the only logical one. In either event, an analysis of Section 12.2 is warranted.

Section 12.2 states in relevant part:

12.2 Prohibited Transfers. **Notwithstanding anything herein to the contrary**, the Members acknowledge and agree that no issuance by the Company or Transfer by any Person of LLC Units or any other interest in the Company may be made which would . . . (iv) violate the then existing provisions of the Primary Debt Financing Documents (unless a written unconditional consent and waiver is first obtained from the Lender); (v) violate any federal securities laws or any state securities or "blue sky" laws (including any investor suitability standards) applicable to the Company or the interest to be Transferred; (vi) cause the Company to be required to register as an "investment company" under the U.S. Investment Company Act of 1940, as amended; (vii) cause the Company to be considered as terminated pursuant to Section 708 of the Code (or any successor thereto); or (viii) cause the Company to be a publicly traded partnership within the meaning of Section 7704 of the Code (or any successor thereto) [26 U.S.C. § 7704]. **No issuance or Transfer of LLC Units or any other interest in the Company may be made unless (a) an opinion of counsel**, **satisfactory in form and substance to the Board and counsel** for the Company (which requirement for an opinion may be waived, in whole or in part, at the discretion of the Board), is delivered to the Board

_____

[170] *Id.* Presumably, the Board's affirmative vote entitles them to *reject* (not merely defer) a transfer to non-Members.

41

opining that such issuance or Transfer, as applicable, meets the requirements of clauses (iv) through (viii) of this Section 12.2 **and (b) the recipient of the LLC Units has executed a Joinder Agreement. Any purported issuance or Transfer which would otherwise violate the requirements of this Section 12.2 shall be void and of no effect.**[171]

Defendants argue Section 12.2 empowers the Board to police transfers in all instances to ensure that unit transfers will not result in the legal consequences identified in that section. To that end, Section 12.2 states in broad terms, "[n]o issuance or Transfer" of units "may be made" without "an opinion of counsel, satisfactory in form and substance to the Board and counsel for the Company" which "may be waived . . . at the discretion of the Board."[172] Defendants assert there would be no way for the Board or the Company to police compliance with Section 12.2 if intra-Member transfers are independently effective absent Board review.[173]

---

[171] *Id.* § 12.2 (emphasis added).

[172] *Id.*

[173] Defs.' Post-Trial Br. at 42. Defendants also argue that the FNC Documents expressly identify that all transfers require Board approval. *Id.* at 3 (citing JX 34; JX 35; JX 36). But the Agreement contains an integration clause requiring that any amendment to its terms be in writing and approved by a majority of the Members. *See* OA §§ 16.4, 16.14. The Agreement has been amended twice, but neither amendment addressed the FNC Documents. JX 2. Moreover, there is no evidence in the record to suggest that all parties to the Agreement intended that the FNC Documents would modify the means by which unit transfers are authorized under the Agreement. *See* Trial Tr. 246:8–13 (Baker) (admitting the FNC Documents are not part of the Agreement); JX 96 (an attorney for Company counsel Locke Lord stating, "[u]nless each member who wishes to utilize the system executes the document, I don't see how the members had been bound by these [FNC] rules"). In this regard, Defendants cite to Ramsel's highlighted and underlined copy of the Trading Service Operational Manual as evidence that Pearl City appreciated the

Pearl City responds that the "and" conjoining the Board's right to a legal opinion and a Joinder Agreement implies that the former is required only when the latter is required. Because only new Members must execute a Joinder Agreement, Pearl City reasons that Section 12.2 requires an Opinion only for transfers to non-Members. According to Pearl City, this would be consistent with Section 12.1(ii), which states "affirmative" Board approval is required "only to the extent that" a transfer is to a non-Member.[174]

Neither party's proffered interpretation harmonizes all provisions across the Agreement. Defendants' argument that Section 12.2 empowers the Board to affirmatively approve all transfers simply cannot be squared with Section 12.1(ii),

---

Trading Service Operational Manual's provision that, "Transfers that are not made through the Trading Service will be null and void unless they are approved by the Adkins Energy's Board of Governors and comply with [the Agreement]." *See* JX 122. But Ramsel underlined language that appeared to incorporate by reference the Agreement, which he credibly asserts in this litigation conflicts with the FNC Documents' Board approval requirement. I agree that JX 122 does not evidence that Ramsel somehow acknowledged that the FNC Documents would supersede the Agreement with respect to unit transfers. Thus, the FNC Documents do not govern the transfers through which Pearl City undisputedly accumulated more than 56% of Adkins' Units. *See ev3, Inc. v. Lesh*, 103 A.3d 179, 185 (Del. 2014), *opinion revised and superseded*, 114 A.3d 527 (Del. 2014), *as revised* (Apr. 30, 2015) (noting that parties intending for separate agreements to modify contractual rights should expressly identify those agreements as carve-outs to the integration clause).

[174] Pl.'s Opening Post-Trial Br. at 18–19. Pearl City also argues Opinions were never required in the past, but Sections 12.2 and 16.8 of the Agreement together make clear the Board had discretion to waive its right to a legal opinion and waiver of such a condition does not prevent a party from later exercising its right to insist on compliance. *See* OA §§ 12.2, 16.8.

which, as explained above, states plainly that "affirmative consent and approval" by a majority of the Board is required only "to the extent that" a transfer is made to a non-Member.  Defendants' argument also does not sit well within the Agreement's *Chicago Bridge* big picture: it is unreasonable to think the parties would carefully negotiate how one faction could expand their Board membership under Section 5.2 while, at the same time, hinder the possibility of expansion by allowing either faction to stonewall the other with *de facto* discretionary veto rights over all unit transfers.

As for Pearl City's construction, Section 12.2's choice of the past tense ("*has executed* a Joinder Agreement," as opposed to the present tense "executes") signals that the provision contemplates the transferee "has," at some point in time but perhaps not contemporaneously, executed a Joinder Agreement.[175]  Further, Section 5.2 states in relevant part:

> Any change in the number of Governors appointed or elected by Pearl City or the General Member group shall be effective simultaneously with the effectiveness of the Transfer of Membership Interest giving rise to such change (**i.e., upon commencement of the Company's next fiscal quarter following the approval of the Transfer by the Board of Governors**).[176]

---

[175] OA § 12.2 (emphasis added).

[176] *Id.* § 5.2 (emphasis added).

The term "i.e." or "*id est*" is a Latin phrase meaning "that is," which expands or explains the thing to which it refers.[177]  The parenthetical "i.e." defines when a transfer becomes effective—"upon commencement of the Company's next fiscal quarter following the approval of the Transfer by the Board of Governors."[178] At first glance, this language appears to contemplate Board "approval" for all transfers.

In response to this provision, Pearl City contends it must be disregarded because it renders Section 12.1(ii)'s express requirement for affirmative Board approval meaningless and conflicts with the spirit of the Agreement.[179]  I disagree. Sections 5.2, 12.1 and 12.2 can all be harmonized when the Court gives life to Section 12.1's distinction between "affirmative consent and approval . . . determined by a simple majority vote of the Board"—required "to the extent that" transfers involve a non-Member under Section 12.1(ii)—and mere tacit "approval," or recognition of the unit transfer, that occurs after the Board is provided notice of the transfer under Section 12.1(i) and either receives or waives the Opinion required under Section 12.2.  Section 12.1 states expressly in its second sentence that the

---

[177] *i.e.*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/i.e. (last visited March 8, 2021).

[178] OA § 5.2.

[179] *See* Pl.'s Opening Post-Trial Br. at 39 (citing *Chicago Bridge*, 166 A.3d at 926–27 & n.61).

limits in Section 12.2 are subject to "approval requests" as contemplated in that section.[180] Section 12.1 also makes clear that the Board may request an Opinion for the sole purpose of ensuring that prohibited transfers are not consummated; the Board may then only "defer" (not reject) a transfer under Section 12.2 until it receives an Opinion "satisfactory in form and substance."[181]

Thus, the transfer process contemplated by the Agreement functions as follows:[182]

- Section 12.1(i) requires notice of all proposed transfers to be provided to the Board.[183]
- Section 12.1(ii) states, "to the extent that the proposed Transfer is not to an existing Member," the Board must pre-approve "such Transfer" by a simple majority vote.[184]
- The following sentence of Section 12.1 acknowledges, however, that all transfers are subject to the limitations set forth in Section 12.2, "the Board shall consider such approval requests in the order in which they are

---

[180] OA § 12.1.

[181] *See id.* §§ 12.1, 12.2.

[182] I note that the Agreement's lack of ambiguity removes all force from Defendants' argument that Section 5.10 (empowering the Board with general "authority to supervise and control all operations of the Company," "[e]xcept as otherwise provided") should be understood as a gap-filler that entitles the Board to vote on all transfers. *See* Defs.' Post-Trial Br. at 23.

[183] OA § 12.1. I address the timing of this notice below.

[184] *Id.*

46

received . . . and [the Board] may *defer* the approval of Transfer requests until a later date in order to comply with such limitations."[185]

- Section 12.2 proceeds to outline eight types of "Prohibited Transfers." It then empowers the Board to ensure transfers comply with Section 12.2(iv)–(viii) by authorizing the Board to request an "opinion of counsel, satisfactory in form and substance to the Board and counsel for the Company (which requirement may be waived . . . at the discretion of the Board)" for transfers prior to their becoming effective.[186]

- If the Board takes no action with respect to the unit transfer(s) "upon commencement of the Company's next fiscal quarter," then it has waived its right to a legal opinion under Section 12.2, thereby "approv[ing]" the transfer such that it "*shall* become effective."[187]

- In the event the Board opts not to seek an Opinion for a transfer prohibited under Section 12.2, it would nevertheless be void *ab initio* under the last sentence of Section 12.2 upon discovery that it violates Section 12.2.[188]

Certainly, the Agreement could have more clearly distinguished between the "affirmative consent and approval" required for transfers to new Members and the tacit "approval" right conferred upon the Board after it receives or waives its right

---

[185] *Id.* (emphasis added). To be clear, the right to defer approval is limited; once the conditions (*e.g.*, delivery of a conforming notice and/or Opinion) are satisfied, the right to defer or withhold approval disappears.

[186] *Id.* § 12.2.

[187] *See id.* § 12.1 (emphasis added). Contrary to Defendants' suggestion, the Agreement does not require "prospective waiver" of an Opinion. Post-Trial Tr. 49:20–50:1. Such a requirement would impose the sort of "affirmative consent and approval" reserved specifically for transfers to non-Members under Section 12.1. Instead, Section 12.2 states that the "requirement for an opinion may be waived, in whole or in part, at the discretion of the Board." OA § 12.2. Reading Sections 12.1 and 12.2 together, the requirement for an Opinion would be deemed waived either upon an express waiver or once the Board opts not to defer the transfer upon commencement of the next fiscal quarter. *See id.* §§ 12.1, 12.2.

[188] *See id.* § 12.2.

47

to request a conforming Opinion.  But the above sequence is the only reasonable construction that harmonizes each of the provisions flagged as relevant by either party.[189]   Section 5.2's definitional reference to Board approval—"i.e., upon commencement of the Company's next fiscal quarter following the approval of the Transfer by the Board of Governors"—can be understood to acknowledge that all transfers are "approv[ed]" by the Board in the sense that the Board has the right to defer recognition of the transfer and to seek an Opinion that the transfer is not among those prohibited under Section 12.2.[190]

---

[189] *See GMG Cap. Invs.*, 36 A.3d at 779–84 (noting that the meaning inferred from a particular contract provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan).

[190] *See* OA §§ 5.2, 12.1, 12.2.  Defendants also make passing reference to another provision of the Agreement, Section 12.6, as supporting their proffered construction.  Section 12.6 states in relevant part: "Treatment of Transferees. . . . [T]he Board may only change such method of allocation [losses, income, gains and expense deductions] on a prospective basis to take effect for the Transfers submitted to the Board for approval in the fiscal quarter following the fiscal quarter in which the Board approves the change in the method of allocation."  JX 2 § 12.6.  Defendants do not endeavor to explain how this provision supports their construction, but presumably they take the language "for the Transfers submitted to the Board for approval" as textual evidence that Board approval was contemplated with respect to all transfers.  Again, Defendants' argument that affirmative Board approval was required in all cases cannot be squared with the clear and unambiguous language Section 12.1(ii).  Reading the Agreement to allow the Board to defer recognition of the transfer pending receipt of an Opinion under Section 12.2 as a form of passive approval, however, makes sense of Section 12.6's reference to "approval."

\*\*\*\*\*

The Agreement confers upon the Board a right to approve unit transfers that will bring new members into the Company, limited only by the requirement that the Board exercise its approval authority reasonably. The Agreement also confers upon the Board the right to request that parties to all unit transfers supply an Opinion to the Board that confirms the transfer does not implicate any of the legal concerns expressly called out in the Agreement. The Board may defer approval of the unit transfer until it receives the Opinion, or it may waive the requirement to supply the Opinion. Upon satisfying the Opinion condition, the unit transfer shall be deemed "approved."[191]

Before addressing whether Pearl City complied with the requirements of Section 12.2, I address the parties' dispute regarding the contours of the "notice" requirement under the Agreement.

---

[191] Though the parties disagreed on the Board's approval rights vis-à-vis intra-Member transfers, it was clear the General Governors objected to the unit transfers that Pearl City relied upon to cross the 56% threshold, and Pearl City was aware of the General Governors' concerns prior to the commencement of fiscal quarter beginning June 1, 2020. *See* JX 108 (April 27, 2020 letter from Gieseke stating the General Governors' intent to deny the transfers); JX 134 (May 29, 2020 notification letter from Pearl City arguing "[i]n no way do these purchases jeopardize the tax status of Adkins"). Thus, contrary to Pearl City's argument, there is no basis to find that the General Governors waived their right to an Opinion concerning the transfers. *See* Pl.'s Opening Post-Trial Br. at 53–55.

## 2. Section 12.1 Does Not Require "Advance" Board Notice of Transfers

Defendants argue that, even if affirmative Board approval is not required for all transfers under the Agreement, Pearl City failed to comply with Section 12.1's requirement that a Member seeking to transfer units provide *prior* notice of that intent to the Board.[192] Pearl City responds that Section 12.1(i) merely requires a putative transferee to provide "written notice" to the Company, without regard to timing, through a Transfer Notice and accompanying Bill of Sale, for recording on the Company's register.[193]

In support of its position, Pearl City cites the plain text of Section 12.1, which reads: "Before a Transferring Member may Transfer its Membership Interest . . . such Member must first (i) give written notice of such proposed Transfer . . . ."[194] Pearl City emphasizes the conspicuous absence of an adjective preceding "notice" akin to "advance"—a term the drafters used several times throughout the Agreement.[195] A requirement for "advance notice" would impose on transferors the sort of timing sequence Defendants ask the Court to read into Section 12.1(i); the drafters chose not to include such language.

---

[192] Defs.' Post-Trial Br. at 43.

[193] Pl.'s Reply Post-Trial Br. at 22.

[194] OA § 12.1.

[195] *See id.* §§ 5.3(c), 5.9.

Further, Section 16.1 provides that, "[a]ny notice, demand, or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served for all purposes . . . two days after the date of its mailing or deposit with such delivery service."[196] The notion that the Board is entitled to receive notice before a unit transfer is even attempted does not jibe with the self-executing notice contemplated by Section 16.1.

Defendants respond that the words "first" and "proposed" serve a functionally equivalent role to "advance," imposing a requirement on transferors to provide notice to the Board prior to initiating a unit transfer so that the Board can approve the transfer. And, according to Defendants, if the Court accepted Pearl City's argument under Section 16.1, then it would be allowing "Pearl City [to] grant itself effective transfers of thousands of Adkins Units before Adkins even knew the identities of the Transferring Members."[197] Defendants maintain that by understanding the words "first" and "proposed" to relate to when a transfer would be effective (i.e., notice must "first" be given of a "proposed" transfer in order for the transfer to be effective), as Pearl City would have it, the Court would have to

---

[196] *Id.* § 16.1.

[197] Defs.' Post-Trial Br. at 45.

read into Section 12.1 the word "effective." According to Defendants, that would alter the meaning of the parties' chosen language.

Defendants' arguments misconstrue the provisions they cite and seek to expand the limited role those provisions play within the larger Agreement. Section 16.1 speaks only of effectuating "notice," which is just one "box" that a transferor must check before the transfer will be deemed effective. Another box to be checked, as already explained, is the Board's right under Sections 12.1 and 12.2 to "defer . . . approval" of a "proposed" transfer pending the production of a satisfactory Opinion confirming the transfers' compliance with Section 12.2(iv)– (viii).[198] Thus, contrary to Defendants' construction, lack of *advance* notice does not conflict with the Board's authority to supervise and control the Company's operations. Nor does it authorize Members to bind the Company to changes in its ownership and allocations without the Board's knowledge. Rather, the Board defers by default the effectuation of certain transfers pending production of a satisfactory Opinion, which it may waive expressly or by recognizing the transfer upon commencement of the next fiscal quarter.[199] Indeed, there would be little logic

---

[198] OA §§ 12.1, 12.2.

[199] In the same vein, Defendants miss the point when they argue notice was ineffective because, under the Bills of Sale, Pearl City was required to pay the seller the purchase price 30 days after the date written. Defs.' Post-Trial Br. at 15 (citing JX 56). The effective date of notice is separate from the effective date of transfer. As explained, the effective date of transfer would be September 1, 2020. The consideration memorialized by the Bills of Sale was undoubtedly exchanged by that time. *See* JX 56. Under Section 12.1, the transfers

behind requiring "advance" notice to the Board when, under Sections 12.1 and 12.2, the Board defers by default, but cannot blithely deny, intra-Member transfer requests. And, for reasons explained, unit acquisitions were already transparent to Adkins Members and the General Governors, who could (and in fact *did*) learn of privately placed purchases days after they were solicited.[200]

Defendants' argument that "effectiveness" cannot be read into Section 12.1 or the Notice of Transfer attached as Exhibit C to the Agreement similarly ignores Section 12.1's role within the Agreement's overall structure. As Defendants themselves acknowledge, Section 12.1 is the only provision that describes how to effectuate a transfer.[201] Section 12.1 makes clear that every transfer is "first" "proposed" and then "become[s] effective upon commencement of the Company's next fiscal quarter following the approval of such Transfer by the Board of Governors."[202] Whether the Board receives notice in advance of a transfer's

---

themselves are effective "upon commencement of the Company's next fiscal quarter." OA § 12.1; *see also id.* § 5.2 ("Any change in the number of Governors . . . shall be effective simultaneously with the effectiveness of the Transfer of Member Interest giving rise to such change (*i.e.*, upon commencement of the Company's next fiscal quarter following the approval of the Transfer by the Board of Governors).").

[200] JX 17 (text messages between Baker and the General Governors discussing Pearl City's offer dated as early as March 7, 2020).

[201] *See* Defs.' Post-Trial Br. at 21 (characterizing Section 12.1 as setting out "two must-do's").

[202] OA § 12.1.

negotiations or after those negotiations are complete but before approval (whether discretionary for transfers to non-Members or implicit upon receipt or waiver of the requisite Opinion for all transfers) makes no difference.

*****

The Agreement unambiguously requires "written" notice of transfers to be submitted at a time chosen by the transferring Members. While Pearl City's strategy of stockpiling proposed private transfers before delivering them *en masse* may be suboptimal in most scenarios, it does not frustrate the Board's limited oversight role. Rather, a bulk delivery of notices likely increases the chance the Board will defer recognition of some (if not all) of those transfers pending production of a costly Opinion, given transfers in bulk pose more legal risk and Section 12.1 provides that transfers must be accepted on a "first come, first served" basis.[203] Indeed, that is what happened here; upon receipt of the notices, the Board effectively exercised its right to receive a conforming Opinion.[204]

---

[203] *See* Trial Tr. 213:8–21 (Gieseke), 233:22–235:2 (Baker); *see also id.* at 358:1–359:16 (Huffman).

[204] *See* JX 74; JX 111.

## C. Pearl City Has Complied with the Unambiguous Terms of the Agreement

As explained above, the Agreement imposes two procedural requirements that bear on Pearl City's transfers: (1) an Opinion "satisfactory in form and substance," and (2) written notice.

### 1. The PC Opinions

It is undisputed that, on August 10, 2020, Pearl City provided the PC Opinions to the General Governors addressing all issues flagged by Section 12.2.[205] In a letter to the General Governors, Locke Lord stated it was willing to approve the PC Opinions.[206] The General Governors then called two special meetings purportedly for the express purpose of "approv[ing]" the private sales.[207] Gieseke confirmed that he was "willing to accept those legal opinions" "based upon the advice [he] received from [Locke Lord]" and that it was fair to say the only thing remaining for Pearl City to appoint a seventh Governor was for the Board to approve the private sales.[208]

---

[205] PTO ¶ 34; JX 163.

[206] JX 176.

[207] JX 183. Gieseke confirmed that the meeting was called "with the intention to approve" the private sales, that Pearl City provided a notice of sale with the transfer documents, that Pearl City provided Bills of Sale in connection with the private sales, and that the PC Opinions supporting the private sales had been submitted. (Gieseke) Dep. 105:1–111:24; *see also* JX 189 (Holland's personal notes, made after a call with Butson the night before Holland's deposition, stating: "[w]e are not opposed to PCE [(Pearl City Elevator)] gaining an extra Board seat").

[208] (Gieseke) Dep. 105:21–109:19.

If the Board approved the private sales at that time, they would have been effective as of September 1, 2020—the start of the next fiscal quarter.[209]

Defendants attempt to escape their own sworn testimony affirming that the PC Opinions were "satisfactory in form and substance" in two ways. First, Defendants invoke the "mend-the-hold" doctrine to argue the Court should not permit Pearl City to submit conforming Opinions belatedly after it commenced litigation.[210] Named after "a nineteenth century wrestling term, meaning to get a better grip (hold) on your opponent,"[211] "the 'mend-the-hold' doctrine is an equitable doctrine intended to prevent a party from asserting grounds for repudiating contractual obligations and then, in bad faith, asserting different grounds for repudiation once litigation has commenced and it becomes apparent the original grounds for repudiation will not work."[212] Writing for the Seventh Circuit, Judge Posner observed that there is substantial overlap between the "mend-the-hold"

[209] Pl.'s Reply Post-Trial Br. at 25 (citing OA §§ 5.2, 12.1).

[210] Defs.' Post-Trial Br. at 47.

[211] *Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 362–63 (7th Cir. 1990) (Posner, J.) (discussing the origins of the mend-the-hold doctrine).

[212] *Health Corp. v. Clarendon Nat'l Ins. Co.*, 2009 WL 2215126, at *14 (Del. Super. Ct. July 15, 2009); *see also Liberty Prop. Ltd. P'ship v. 25 Mass. Ave. Prop. LLC*, 2008 WL 1746974, at *14 (Del. Ch. Apr. 7, 2008) (discussing "mend-the-hold" doctrine but declining to apply it on equitable grounds); *Friel v. Jones*, 206 A.2d 232, 235 (Del. Ch. 1964) ("Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration.").

56

doctrine and bad faith because when "[a] party . . . hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries on another defense for size [he] can properly be said to be acting in bad faith."[213]

The record before the Court simply does not support a finding that Pearl City has proceeded in bad faith.[214] Rather, Pearl City believed, based on the Agreement's text, that an (expensive) Opinion was not necessary for intra-Member transfers. History supported that view, as the Board has never sought an Opinion with respect to any unit transfer.[215] Absent evidence of bad faith, the "mend-the-hold" doctrine is inapt.[216]

---

[213] *Harbor Ins. Co.*, 922 F.2d at 363; *see also Bank of New York Mellon v. Commerzbank Cap. Funding Tr. II*, 2011 WL 3360024, at *8 n.71 (Del. Ch. Aug. 4, 2011) (citing with approval *Liberty Property*'s analysis); *Health Corp.*, 2009 WL 2215126, at *9 n.12 (citing with approval *Harbor Insurance*'s analysis).

[214] Defendants cite cases where, in the context of advance notice bylaws, Delaware courts have not permitted stockholders to ignore procedural deadlines and then seek to remedy them after the fact. *See BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 980 (Del. 2020). In those cases, however, the parties agreed the procedure was clear and simply decided not to follow it; in other words, they arguably proceeded in bad faith.

[215] Trial Tr. 121:12–15 (Gieseke), 423:20–424:6 (Foley).

[216] *See Bank of New York Mellon*, 2011 WL 3360024, at *8 n.71 ("[I]t cannot be said, based on the record before the Court, that [Defendants] have [taken a different position from the one previously taken] in bad faith, or that the position the Defendants now assert is somehow phony or trumped up. . . . Under these circumstances, the Court concludes that the 'mend-the-hold' doctrine does not bar the Defendants from asserting that same position here.").

Defendants next argue the PC Opinions are not substantively "satisfactory" under Section 12.2. In this regard, they argue the Court cannot assess the legal sufficiency of the PC Opinions since they are hearsay and were received in evidence on the condition they would not be considered for the truth of the matters asserted therein.[217] According to Defendants, the "only substantively admissible expert legal opinion the Court heard was from Pearl City's tax expert, Gary Huffman," who "opined on only two (2) of the five (5) opinion of counsel deliverables required under [Section] 12.2 (iv)–(viii)."[218] Thus, say Defendants, any declaration by the Court as to the validity of the PC Opinions would require undue speculation. And, while Defendants may have been satisfied with the PC Opinions in August 2020, they insist they have serious doubts about the PC Opinions now. When pressed for an example, Defendants pointed to Pearl City's failure to explain why it submitted three separate opinions from different law firms (as opposed to one).[219] They also discovered that Pearl City submitted "secret confidential bids on FNC" and, in any event, "[t]here is no rule that says you can't change your mind."[220]

---

[217] Defs.' Post-Trial Br. at 49.

[218] *Id.* at 48.

[219] Post-Trial Tr. 82:3–83:3.

[220] *Id.* at 81:15–82:12.

None of the purported problems that Defendants identify with respect to the PC Opinions have anything to do with the securities and tax matters the Board is empowered to review under Section 12.2(iv)–(viii).[221]  To reiterate, Defendants do not have arbitrary power to deny a transfer under Section 12.2; they may only "defer" transfers until they have in hand Opinion(s) "satisfactory in form and substance."[222]  And, contrary to Defendants' suggestion, the Court may consider the PC Opinions for the facts that they exist and say what they say (true or not).[223]  Further, the fact Pearl City delivered several legal opinions is hardly suspicious, as Section 12.2 touches on various intricate tax and securities matters that require different legal expertise.  In other words, Defendants' newfound "reservations" concerning the PC Opinions are not credible.

In view of Defendants' acceptance of the PC Opinions at the start of litigation, their inability to point to a relevant change of circumstance in the interim, and the

---

[221] *See* OA § 12.2.  Defendants' inability to cite any legitimate objection is striking given that they have had the PC Opinions throughout this proceeding and maintain regular contact with counsel, both their own and the Company's.  *See* JX 176 (Locke Lord email discussing the PC Opinions, stating that the Board could accept them, and implicitly acknowledging they were "satisfactory in form and substance" to "counsel for the Company" under Section 12.2).

[222] OA §§ 12.1, 12.2.

[223] *See* 2 McCormick on Evidence § 249 (8th ed.) (explaining that a statement is "not subject to attack as hearsay" when its purpose is to establish the statement was made).  On their face, the PC Opinions address each of the matters identified in Section 12.2.

Agreement's clear instruction that the Board may not wield its right to receive an Opinion as a weapon to strike down transfers arbitrarily,[224] the preponderance of the evidence indicates the PC Opinions satisfied Section 12.2.[225] Because the Court has found an Opinion was required to effectuate the transfers, the relevant date relating to the parties' notice dispute is September 1, 2020, the date the PC Opinions were delivered. Pearl City mailed written notice on May 29, 2020, and the Transfer Notices and Bills of Sale were received on or around June 2, 2020.[226] Thus, Pearl City's written notice of its transfers would have been effective by the date Pearl City was eligible to have the unit transfers recognized by the Company.

## 2. The Written Notice

The General Governors reflexively invoke the "mend-the-hold" doctrine again to argue that Pearl City's notice of the transfers was somehow deficient. But the Court already has determined that Pearl City reasonably understood notice to be

---

[224] *See* OA § 12.1.

[225] At trial, Pearl City produced credible and unrebutted expert testimony from Gary Huffman, who testified that Pearl City's transfers would have no effect on Adkins' tax status. Trial Tr. 329:20–389:20 (Huffman). Huffman's testimony thereby directly addresses the primary concern raised by the General Governors at every stage prior to trial as justification for their opposition to Pearl City's transfers. *See* Defs.' Post-Trial Br. in Opp'n to Pl.'s Mot. to Expedite and Mot. for a Status Quo Order (D.I. 22) at 17–19; Defs.' Answer to Verified Compl. (D.I. 39) ¶ 2; *see also* Trial Tr. at 371:9–22 (Huffman) (confirming this was not "even a close call").

[226] PTO ¶¶ 32–33.

required only prior to the time it sought to have the unit transfers recognized by the Company as of the next fiscal quarter. Consistent with Section 16.1, Pearl City mailed notice two days prior to the start of the next fiscal quarter. As with the Opinion requirement, there is no reason to find that Pearl City's notice was delivered in bad faith.

The General Governors are left to quibble with the substance of the May 29 Letter and Transfer Notices. Specifically, they assert the May 29 Letter: (1) arrived one hour after the Complaint in this action was filed, (2) assumed consummation of all private and public transfers, and (3) demanded acknowledgment of the relief requested.[227] According to Defendants, this is not proper prior notice as required under Section 12.1.

None of the purported deficiencies identified by Defendants render Pearl City's notice substantively void. The Complaint was filed after the General Governors informed Pearl City they would not recognize Pearl City's acquisition of units, a position Pearl City believed in good faith was contrary to the Agreement.[228]

---

[227] *See* Defs.' Post-Trial Br. at 43 (citing JX 134). I note that Defendants did not raise the argument that Section 12.1 specifies that the *transferring* Member should provide notice, while Pearl City was in all cases the transferee. Defendants' ambivalence is likely due to the fact that Pearl City delivered notice jointly on behalf of itself and the transferor, making the argument a distinction without a difference. *See* JX 132; JX 138. In any event, "[i]ssues not briefed are deemed waived." *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999).

[228] *See* JX 70.

Though the Court has held the Board was entitled to defer approving the transfers until production of a satisfactory Opinion, Section 12.1 prescribes no magic words Pearl City had to incant in its May 29 Letter—only that it "describe the terms and conditions of the proposed Transfer."[229] Confined by the record, Defendants do not (because they cannot) suggest that the required content was absent from Pearl City's notices.

Defendants' only substantive argument based on the text of the Agreement is that Section 12.1(i) requires "a copy of the proposed contract of sale" to be "contain[ed]" with the written notice, but Pearl City mailed the Transfer Notices and Bills of Sale under "separate cover."[230] It is undisputed, however, that the executed Transfer Notices and Bills of Sale were mailed to Adkins and Defendants via Federal Express the same day, and Adkins received them no later than June 2, 2020.[231] Furthermore, the Transfer Notices and Bills of Sale expressly provide that Pearl City and the Transferring Member were jointly delivering the documents.[232] The fact the documents were delivered in separate envelopes does not violate the Agreement's

---

[229] *See* OA § 12.1.

[230] *Id.*; s*ee* Defs.' Post-Trial Br. at 44 (citing JX 134).

[231] PTO ¶ 33; JX 7; JX 132; Trial Tr. 49:1–6 (Ramsel), 289:2–9 (Baker); Defs.' Post-Trial Br. at 4.

[232] JX 7.

notice requirement.[233]  Thus, Pearl City substantively complied with all aspects of the Agreement's notice requirements.

## D. Defendants' Affirmative Defenses Fail

Defendants raise two affirmative defenses: unclean hands and material breach.  I address each in turn.

### 1. Unclean Hands

The doctrine of "unclean hands" provides that "a litigant who engages in reprehensible conduct in relation to the matter in controversy . . . forfeits his right to have the court hear his claim, regardless of its merit."[234]  "[T]he purpose of the clean hands maxim is to protect the public and the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims,

---

[233] I note that my findings regarding Pearl City's compliance with the Agreement's procedural and substantive transfer requirements puts to bed Defendants' ripeness argument, namely that the dispute was not ripe when filed because Pearl City failed to meet all the procedural prerequisites prior to filing its Complaint.  *See* Defs.' Post-Trial Br. at 37; *see also Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479–80 (Del. 1989) (listing ripeness as among the four elements required for a Court to exercise its statutory authority to hear a claim seeking a declaratory judgment).  At the time suit was filed, Pearl City had mailed notices and thus believed at that time that it had fulfilled its obligations under the Agreement and was entitled to a seventh Governor upon commencement of the new fiscal quarter two days later, on June 1.  The General Governors had informed Pearl City prior to initiating this action that they would refuse to recognize Pearl City's newly acquired units.  *See* JX 108; *see also* JX 74; JX 105; JX 111.  And they continued thereafter to oppose Pearl City's right to elect its fourth Governor.  *See* Post-Trial Tr. 81:20–83:18. Accordingly, the dispute is ripe for adjudication.

[234] *Nakahara v. NS 1991 Am. Tr.*, 739 A.2d 770, 791–92 (Del. Ch. 1998) (internal quotations omitted).

regardless of their merit. As such it is not a matter of defense to be applied on behalf of a litigant; rather it is a rule of public policy."[235] As refined by this court, "[t]he question raised by a plea of unclean hands is whether the plaintiff's conduct is so offensive to the integrity of the court that his claims should be denied, regardless of their merit."[236] "This court has consistently refused to apply the doctrine of unclean hands to bar an otherwise valid claim of relief where the doctrine would work an inequitable result."[237]

Defendants assert that the following acts Pearl City took in furtherance of its "schem[e]" to accumulate units amount to unclean hands:[238]

- Pearl City falsely reported the number of units it owned at various times.[239] By "sandbagging" the General Members with their accumulation of units through private transfers, Defendants argue Pearl City: (1) robbed the minority of their ability to seek a control premium for the units, and (2) robbed the minority unitholders from deploying their own capital to stave off a change in control.[240]

---

[235] *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976).

[236] *Gallagher v. Holcomb & Salter*, 1991 WL 158969, at *4 (Del. Ch. Aug. 16, 1991), *aff'd sub nom. New Castle Ins., Ltd. v. Gallagher*, 692 A.2d 414 (Del. 1997).

[237] *Dittrick v. Chalfant*, 948 A.2d 400, 408 n.18 (Del. Ch. 2007), *aff'd*, 935 A.2d 255 (Del. 2007).

[238] *See* Defs.' Post-Trial Br. at 55. Defendants also argue the doctrine of unclean hands should apply because Pearl City did not comply with Section 12.1's notice provision. *See* Defs.' Post-Trial Br. at 56. For reasons already explained, however, Pearl City's actions complied with Section 12.1; this argument fails *a fortiori*.

[239] *See* JX 7.

[240] *Id.*

- Pearl City enlisted the help of a broker to place confidential standing offers on FNC.[241] Pearl City's use of the broker to purchase units for its own account violated the Adkins' Trading Service Operational Manual.[242]
- Pearl City was offering two different prices on the FNC and to its patrons in private purchases, thereby breaching its fiduciary duties of loyalty to minority Members.[243]

Defendants maintain that the Court "should not and cannot endorse this false and faithless conduct by granting Pearl City the relief it requests."[244]

None of the acts asserted by Defendants justifies this Court's equitable intervention to bar Pearl City's claims. Courts have refused to apply the unclean-hands doctrine where the conduct at issue involved no intent to deceive, or if the degree of inequity resulting from the conduct is *de minimis*.[245] For an omission to be material, there must be "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[246] The purported omission within Pearl City's Transfer Notices relates to 277 units purchased in February 2020,

---

[241] JX 41; JX 35 at 2, ¶ 11.

[242] JX 35 at 2, ¶ 11.

[243] *See* JX 98; JX 95.

[244] Defs.' Post-Trial Br. at 6.

[245] *See Wilmont Homes, Inc. v. Weiler*, 202 A.2d 576, 580–81 (Del. 1964); *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 81 (Del. Ch. 2008); *Gallagher*, 1991 WL 158969, at *4.

[246] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985).

roughly 4% of the 6,475 units it acquired through private sales from existing Members.[247] I do not view this error as material. There is also no evidence of bad faith, as Pearl City excluded the units because they were not yet reflected on the Company's register.[248] Pearl City owned 50% of Adkins' units since the Company's founding. Thus, Pearl City's patrons (as well as the General Governors) were presumably aware that Pearl City's purchase of any more units might warrant a control premium.

As for the FNC purchases, as noted, there is no reliable evidence on record that the FNC Documents were made binding on Pearl City or the Members. Thus, there is no inequity here: Pearl City did not breach the FNC Documents because they were not binding. At best, they were guidelines for those trading on FNC.

Finally, Pearl City's purchase of different units at different prices from its patrons does not warrant equitable intervention under these facts. Delaware law on this matter is well-settled:

> [A]s a general principle our law holds that a controlling shareholder extending an offer for minority-held shares in the controlled corporation is under no obligation, absent evidence that material information about the offer has been withheld or misrepresented or that

---

[247] *See* JX 7.

[248] Trial Tr. 73:1–16 (Ramsel).

the offer is coercive in some significant way, to offer any particular price for the minority-held stock.[249]

Defendants cite *Unocal Corp. v. Mesa Petroleum Co.* to argue that, because Pearl City embarked on a purely private solicitation to only its patrons, it violated its fiduciary duties.[250] *Unocal*, however, was decided in the context of a public tender offer.[251] Pearl City's transfers were the product of private sales placed among Members who were on notice of Pearl City's majority-owner status. Defendants admitted at trial that any Member was free to offer any price on FNC; in other words, the parties were free to negotiate price as a matter of course.[252] Indeed, the price of Pearl City's cash offer was based on an FNC bid posted by Baker.[253] Accordingly, Pearl City did not violate any obligation, under the Agreement or otherwise, in the course of its acquisition of units to reach the 56% threshold. Its hands are clean.

---

[249] *In re Ocean Drilling & Expl. Co. S'holders Litig.*, 1991 WL 70028, at *3 (Del. Ch. Apr. 30, 1991).

[250] 493 A.2d 946 (Del. 1985).

[251] *Unocal*, 493 A.2d at 956.

[252] Trial Tr. 221:8–21 (Gieseke).

[253] JX 9 at 403.

## 2. Material Breach

"A prior material breach by one's counterparty is an excuse for non-performance."[254] "The question whether the breach is of sufficient importance to justify non-performance by the non-breaching party is one of degree and is determined by 'weighing the consequences in the light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.'"[255]

The Court has found Pearl City's conduct comported with the express contractual requirements set forth in the Agreement. And for reasons explained, the FNC Documents are not binding. Accordingly, Defendants' material breach defense fails.

## E. Attorneys' Fees

Pearl City asks the Court to award its legal fees incurred in this action.[256] Under the American Rule, each party typically must bear its own litigation expenses, including counsel fees.[257] "This court has the discretion, however, to shift litigation expenses, in whole or part, when a party to the litigation has engaged in bad faith

---

[254] *Costantini v. GJP Developers, Inc.*, 2015 WL 5122992, at *8 (Del. Ch. Aug. 24, 2015).

[255] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *13 (Del. Ch. Jan. 25, 2013).

[256] Pl.'s Opening Post-Trial Br. at 58.

[257] *Tandycrafts, Inc. v. Initio P'rs*, 562 A.2d 1162, 1164 (Del. 1989).

litigation conduct."[258] The bad faith exception may be invoked only where there is "clear evidence" that the party against whom the sanction is sought has acted in subjective bad faith.[259] I deny Pearl City's request for a fee shift as I am satisfied the General Governors' asserted defenses fall well short of the "bad faith conduct" that would warrant an award of attorneys' fees.[260]

## III.    CONCLUSION

For the reasons discussed above, Pearl City is entitled to declaratory judgments under Section 18-110 that it has complied with the Agreement in all relevant respects and is entitled to seat Daly as the seventh Governor on the Board. Pearl City shall submit a conforming final judgment on notice to Defendants within ten (10) days.

---

[258] *Ensing v. Ensing*, 2017 WL 880884, at *11 (Del. Ch. Mar. 6, 2017).

[259] *Arbitrium (Cayman Is.) Handels AG v. Johnston*, 705 A.2d 225, 232 (Del. Ch. 1997), *aff'd*, 720 A.2d 542 (Del. 1998).

[260] *See Beck v. Atlantic Coast PLC*, 868 A.2d 840, 851 (Del. Ch. 2005).